# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TISHA ENGLAND, et al.,

          Plaintiffs,

        vs.

RYAN SCHRAND,

          Defendant.

Case No. 1:11-cv-93

Weber, J.

Litkovitz, M.J.

**REPORT AND**

**RECOMMENDATION**

Plaintiffs Tisha England and Deborah Burnam bring this action pursuant to 42 U.S.C. § 1983 on behalf of their daughters, Jackee England, I'geanna England, and Janee Burnam, against Ryan Schrand, a police officer employed by the North College Hill Police Department.[1] Plaintiffs sue defendant Schrand in his individual capacity only. This matter is before the Court on defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Doc. 24), plaintiffs' response in opposition to defendant's motion (Doc. 25), and defendant's reply memorandum in support of the motion. (Doc. 26).

## I. Facts

The Court has adopted plaintiffs' version of the facts where the facts are in dispute, as required when evaluating a defense of qualified immunity on a motion for summary judgment.

---

[1] The daughters are identified only by their initials in the complaint. However, the parties refer to them by their full names and as the plaintiffs in the motion for summary judgment and related filings. The undersigned will therefore do the same.

*See Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008).

This case arises out of defendant's encounter with Jackee England ("Jackee"), I'geanna England ("I'geanna"), and Janee Burnam at North College Hill High School (NCHHS) on September 1, 2009. On that date, the three girls were students at NCHHS and defendant Schrand was working as a police officer for the North College Hill Police Department. As typically occurred at the end of most school days, after school that day a majority of the combined 1,000 students who attended NCHHS and the junior high school exited the front of the school onto a field that ran along Galbraith Road. (Burnam Depo., p. 25; J. England Depo., pp. 23-24; Affidavit of Darnell "Ben" Smith[2], ¶ 2, Doc. 23, Exh. B; Affidavit of Angela Mulcahy[3], ¶ 3, Doc. 23, Exh. A). The field was approximately one-fourth the size of a football field. The school field was typically loud and chaotic during the daily dismissals, and it was common for fights to occur among students. (J. England Depo., p. 62; Mulcahy Aff., ¶ 4; Smith Aff., ¶ 3). For that reason, several NCHHS teachers and administrators supervised the students in the field at dismissal. (J. England Depo., p. 62). It was also routine for a North College Hill police officer to be parked across the street from the high school. (Schrand Depo., p. 9).

On September 1, 2009, plaintiffs met at their lockers after the final bell and exited onto the school field. (Burnam Depo., pp. 32-33; J. England Depo., pp. 30-31; I. England Depo., pp. 24-25). Officer Schrand was parked across the street from the high school in his marked police cruiser with his K9 partner watching students exit the school. (Schrand Depo., pp. 9, 14). Plaintiffs saw Officer Schrand seated in the police cruiser. (J. England Depo., p. 34; Burnam

---

[2]Smith, who is also referred to as "Mr. Smitty," was a part-time security officer at NCHHS.

[3]Mulcahy is a teacher at NCHHS, and she was one of the teachers supervising the school field the day of the incident. (Mulcahy Aff., ¶¶ 2, 5).

Depo., p. 49). Once outside, I'geanna, Jackee and Burnam became involved in a verbal altercation with another group of students led by Brianna Bray. (Burnam Depo., pp. 41-43, 47, 48, 67; Mulcahy Aff., ¶¶ 5, 6, 8). Bray screamed at Jackee, threatened to beat her up, and made a punching gesture into her hand. (J. England Depo., pp. 34-36). Jackee screamed back at Bray that she was going to beat her up, and both of them cursed at each other. (J. England Depo., p. 41). The two girls were yelling loud enough to draw the attention of the other students, who began circling around anticipating that there was going to be a fight. (J. England Depo., pp. 41-42; Burnam Depo., p. 42). At least one hundred and as many as two hundred students were gathered in the school field at this point. (Schrand Depo., p. 13; Mulcahy Aff., ¶ 6; Smith Aff., ¶ 5). The other students were egging the girls on. (J. England Depo., p. 69). Jackee's sister, Generra, tried to stop the fight by pulling Jackee and I'geanna back and telling them not to fight. (J. England Depo., pp. 52-53). Smith and Mulcahy heard yelling, screaming and arguing and had to pull students out of the way to get to the fight. (Smith Aff., ¶¶ 5, 6; Mulcahy Aff., ¶¶ 6, 7). Mulcahy witnessed Jackee, I'geanna and Burnam yelling at Bray and another girl, and she heard all of the girls arguing and screaming at each other, enticing each other to fight, and threatening to "beat up" the other group of girls. (Mulcahy Aff., ¶ 8).

Defendant Schrand heard the yelling and screaming and witnessed a crowd forming by the driveway that ran through the school field. (Schrand Depo., p. 16). He saw a girl he knew as Bray take off her jacket and a girl he later came to know as Jackee England throw a backpack or something similar off, and he saw the two girls square off while about five feet apart and start throwing punches in the air toward each other as they moved closer together. (Schrand Depo., pp. 16-17). Schrand lost sight of the two girls when the crowd formed around them. (Schrand

3

Depo., pp. 17-18). Schrand pulled his police car up onto the driveway between Jackee and Bray. (Schrand Depo., p. 18; J. England Depo., p. 39). Although Schrand testified that he activated the sirens and lights when he pulled the car up (Schrand Depo., p. 18), according to plaintiffs, the car did not have its lights and sirens on. (J. England Depo., p. 42; Burnam Depo., p. 49). Smith and Mulcahy described the scene on the field as "very loud and extremely chaotic," and both individuals stated they would classify the scene after Schrand arrived as a "riot." (Smith Aff., ¶¶ 5, 7; Mulcahy Aff., ¶¶ 6, 11). Schrand also described the scene as a "riot." (Schrand Depo., p. 20). Schrand was the only officer on the scene, and after he exited his cruiser both Mulcahy and Smith heard him continuously yell for the students to stop fighting and calm down. (Mulcahy Aff., ¶ 11; Smith Aff., ¶ 7).

Schrand told Bray she was under arrest, and she was compliant and allowed Schrand to handcuff her. (Schrand Depo., p. 19). At some point after she had been arrested and while still handcuffed, Bray slipped away and ran up to the McDonald's restaurant on Galbraith, where she was once again apprehended by someone. (Schrand Depo., p. 32; Smith Aff., ¶ 8).

Schrand had originally put out a call that he had a large fight in progress at the high school, but he placed an officer needs assistance call after he ran out of handcuffs. (Schrand Depo., pp. 20, 39, 40).

Jackee testified at her deposition that after she saw the police car pull up, she turned around with her back towards the car and walked away at a normal pace with I'geanna and Burnam in front of her. (J. England Depo., pp. 42, 44). She testified that "[i]t was a while before [Schrand] caught up" with the three of them as they were at the police station by the stop sign and about to go behind the school when Schrand came up and grabbed her and put his legs

4

between her. (J. England Depo., pp. 44, 47). She clarified that the stop sign was actually only about 20 feet from the driveway. (J. England Depo., p. 45). She tried to catch herself with both hands as she fell on the concrete sidewalk after Schrand put his legs between hers. (J. England Depo., pp. 44, 46-47, 48). At this point, Schrand had Bray, who was handcuffed, in his hand, and he let Bray go to pull Jackee up by her shoulder so that she was standing, and he handcuffed Jackee. (J. England Depo., pp. 44, 48-49). He handed Jackee to "Mr. Smitty" as Schrand was the only police officer at the scene, he had Bray in custody already, he had "tried to get [Jackee]" after Bray, and he "was trying to get the other girls." (J. England Depo., pp. 48-49). Schrand did not say anything or give Jackee any type of verbal warning. (J. England, Depo. p. 46). According to Jackee, it was loud but not so loud that she could not hear someone talking to her. (J. England Depo., p. 46). She would "not really" describe the scene as chaotic in the sense that people were not "screaming to get away." (J. England Depo., pp. 46-47). Jackee testified that after Schrand handcuffed her and handed her to Smith, he then went to get Burnam, who had stopped a little bit ahead of Jackee to see what was happening with her. (J. England Depo., p. 50). Jackee fractured her wrist when she tried to catch herself as she fell on the sidewalk after Schrand tripped her. (J. England Depo., pp. 53, 56).

Burnam testified that after Schrand pulled up in his car, the circle of students dispersed and she immediately turned and walked away. (Burnam Depo., pp. 51, 61). Schrand came up behind Burnam, stuck his foot between her legs as she was walking, and "swept [her] off the ground." (Burnam Depo., p. 52). She did not hear anything and, according to Burnam, it was "really quiet" as everyone was getting away. (Burnam Depo., pp. 52-53). Schrand did not give her a verbal warning before he swept her feet from under her. (Burnam Depo,, p. 53). Burnam

5

testified that she first observed Schrand when he swept her to the ground with his feet. (Burnam
Depo., p. 52). After Burnam fell to the ground, she bounced up and grabbed her phone to call
her mother. (Burnam Depo., p. 52). Schrand smacked her with the palm of his hand and
knocked her back down to the ground. (Burnam Depo., pp. 52-53). She thinks Schrand told her
at that point to stay on the ground. (Burnam Depo., p. 56). After she stood up, Schrand
handcuffed her. (Burnam Depo., p. 59). Additional police officers came and walked plaintiffs
over to the police station next door. (Burnam Depo., pp. 58-59). The fire department gave
Burnam an ice pack for her right knee, which she sprained in the fall. (Burnan Depo., pp. 60, 70,
72).

I'geanna testified at her deposition that after Schrand pulled his car onto the driveway,
the students scattered in all directions. (I. England Depo., p. 26). She turned and walked away
with her sisters and Burnam. (I. England Depo., pp. 31, 42). She was walking faster than her
sisters. (I. England Depo., p. 31). She did not see Schrand interact with or handcuff Jackee. (I.
England Depo., p. 32). Schrand grabbed her and handcuffed her approximately five minutes
after pulling his car onto the driveway. (I. England Depo., pp. 34-37). After handcuffing her, he
immediately took her to the police station. (I. England Depo., p. 46).

I'geanna, Jackee and Burnam were charged with fourth degree misdemeanor disorderly
conduct, and I'geanna was charged with second degree misdemeanor obstructing official
business. (Doc. 24, Exh. C). Although the three testified at their depositions either that they
could not recall the outcome of the criminal charges in Juvenile Court or that all charges had
been dismissed against them (Burnam Depo., p. 81; J. England Depo., pp. 73-74; I. England
Depo., pp. 21-22), defendant has submitted certified copies of the criminal charges which

6

establish that each girl admitted the amended charge of minor misdemeanor disorderly conduct and was adjudged to be delinquent. (Doc. 24, Exh. C). The remaining charge of obstructing official business against I'geanna was dismissed as part of a plea agreement. (*Id.*).

## II. Defendant's motion for summary judgment

Defendant Schrand moves for summary judgment pursuant to Fed. R. Civ. P. 56 on the ground there are no genuine issues of material fact and he is entitled to qualified immunity from liability on plaintiffs' claims against him as a matter of law. (Doc. 24). Defendant argues that accepting plaintiffs' version of the facts, he did not violate their constitutional rights and none of his interactions with plaintiffs on the date of their arrests constituted a violation of a clearly established law. Defendant contends that he faced a riot situation, he chose the minimal use of force option available to him under the circumstances in order to gain control of the situation, and he ceased using force once each of the plaintiffs was under control. Defendant contends that his actions were objectively reasonable under the totality of the circumstances.

In response, I'geanna England concedes that defendant is entitled to summary judgment on her claim against him. (Doc. 25 at 1). She acknowledges that her deposition testimony does not support her claim against defendant Schrand and that there is no other evidence to support her claim. (*Id.*).

Plaintiffs Jackee England and Janee Burnam (hereinafter "plaintiffs") contend that defendant is not entitled to qualified immunity under the clearly established law as it stood on the date of defendant's interactions with them. Plaintiffs acknowledge that in assessing whether defendant Schrand used excessive force, the Court must examine the totality of the circumstances from the perspective of a reasonable officer at the scene, taking into consideration

7

the three factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989)[4]. However, plaintiffs assert

that within the specific factual context presented here, the law was clearly established as of

September 1, 2009, that a police officer could force a person to the ground under only one of two

scenarios: (1) the officer suspected the individual had committed a "sufficiently serious offense,"

the officer reasonably believed the plaintiff was continuing to try to evade arrest or might take

flight, and the plaintiff was aware the police were attempting to seize her, or, in the alternative,

(2) the officer was confronted with a scene "sufficiently" chaotic that he was required to act

quickly to gain control of the situation. (Doc. 25 at 6). Plaintiffs contend defendant was not

faced with either scenario here because according to plaintiffs' version of events, defendant gave

plaintiffs no verbal warning or opportunity to comply "before sweeping them to the ground" and

defendant did not face a chaotic scene so as to justify proceeding in this manner. (Doc. 25 at 9).

Plaintiffs argue that defendant's actions were unlawful and the unlawfulness would have been

apparent in light of clearly established Sixth Circuit law.[5]

### III. Fed. R. Civ. P. 56 Standard

A motion for summary judgment should be granted if the evidence submitted to the Court

demonstrates that there is no genuine issue as to any material fact and that the movant is entitled

to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

---

[4]Those three factors are "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

[5]Plaintiff Burnam does not discuss whether Schrand's act of "smacking" her on the head was unlawful. (*See* Burnam Depo., pp. 52-56). Plaintiffs contend only that Schrand's act of "sweeping them to the ground" was unlawful and the unlawfulness of this action would have been apparent to a reasonable officer in light of the clearly established law on September 1, 2009. (Doc. 9 at 10). In any event, plaintiffs – who bear the burden of refuting defendant's claim of qualified immunity – have failed to proffer any authority to show that Schrand's act of striking Burnam once with an open palm, under the circumstances of effecting her arrest, violated her clearly established rights.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989) (quoting *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it. . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323-24. The moving party need not support his motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street*, 886 F.2d at 1479-80. The Court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*,

9

477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## IV. Defendant should be granted qualified immunity on plaintiffs' Fourth Amendment claims.

Qualified immunity "shields government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (citing *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)). Qualified immunity not only insulates government officials from individual liability for money damages, but also from the burdens and expenses of litigation and trial. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605 (6th Cir. 2006) (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). Once a defendant raises a qualified immunity defense to a claimed constitutional violation, the plaintiff must satisfy a two-pronged analysis: (1) Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the official's conduct violated a constitutional right, and (2) if a violation could be made out on a favorable view of the plaintiff's submissions, was the right clearly established at the time of the injury? *Saucier*, 533 U.S. at 201. In its discretion, the court may initially address either of these questions in light of the circumstances of the particular case before it when resolving an official's qualified immunity claim. *Pearson,* 555 U.S. 223. When evaluating the defense of

10

qualified immunity on a motion for summary judgment, the court must adopt the plaintiff's version of the facts. *Parsons*, 533 F.3d at 500.

The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Saucier*, 533 U.S. at 201. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Baker*, 471 F.3d at 605 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 606 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (quoting *Saucier*, 533 U.S. at 201-02).

The federal right at issue here is plaintiffs' constitutional right to be free from the use of excessive force. A claim that a police officer used excessive force in the course of an arrest is properly analyzed under the Fourth Amendment and its "objective reasonableness" standard. *Graham*, 490 U.S. at 395. *See also Ciminillo v. Streicher*, 434 F.3d 461, 464-65 (6th Cir. 2006). Under this standard, the court must take into consideration the totality of the circumstances. *Graham*, 490 U.S. at 396. In applying the objective reasonableness test, the court is required to pay "careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* The test of the "reasonableness" of a particular use of force by a police officer is objective and "must be judged from the perspective of a reasonable officer on

11

the scene, rather than with the 20/20 vision of hindsight." *Id.* The court is not to substitute its own ideas as to what is "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler,* 215 F.3d 594, 602 (6th Cir. 2000). In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. A mistaken belief may still be a reasonable belief, and the fact that it turned out to be mistaken does not undermine its reasonableness as considered at the time of the acts. *Frodge v. City of Newport,* No. 11-5458, 2012 WL 4773558, at *9 (6th Cir. Oct. 5, 2012) (citing *Saucier,* 533 U.S. at 205). In determining whether a defendant's use of force was reasonable, the Court must balance "'the nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests' against the countervailing governmental interests at stake." *See Graham*, 490 U.S. at 396. In the context of an excessive force claim, it is not enough for the plaintiff to show that the defendant's use of force was excessive under the Fourth Amendment in order to defeat qualified immunity. Rather, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed. *Id.* at 605. To resolve this issue, this Court must look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within this circuit, and finally to decisions of other circuits. *Baker*, 471 F.3d at 606.

In the present case, the Court finds it unnecessary to resolve whether defendant Schrand's use of force could be considered excessive so as to constitute a violation of plaintiff's Fourth Amendment rights. Rather, accepting plaintiffs' factual allegations as true, plaintiffs have failed to carry their burden to show that defendant had notice that "the manner in which the force he

12

used had been previously proscribed" as of September 1, 2009, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Baker*, 471 F.3d at 605, 606. Thus, the second prong of the qualified immunity analysis is not satisfied.

The issue presented here is framed by this Court follows: Whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no command by the police, had a clearly established right not to be swept to the ground by a police officer, on September 1, 2009. Defendant discusses a number of appellate and district court decisions from the Sixth Circuit wherein the court found the defendant officer's use of force was objectively reasonable under the Fourth Amendment and granted qualified immunity based on facts that defendant alleges are similar to the facts of this case. (Doc. 24 at 19-20, citing cases). Defendant argues that these cases establish his actions were objectively reasonable given the totality of circumstances he confronted on September 1, 2009, such that he is entitled to qualified immunity from liability on plaintiffs' claims against him.

Plaintiffs, who bear the burden of refuting defendant's claim of qualified immunity, cite two cases from the Sixth Circuit for the proposition that a police officer can force a person to the ground under only of two alternative scenarios. (Doc. 25 at 6, citing *Goodrich v. Everett*, 193 F. App'x 551 (6th Cir. 2006) and *Lewis v. Downs*, 774 F.2d 711 (6th Cir. 1985)). Plaintiffs allege that under the first scenario, three conditions must be satisfied: (1) the officer suspects the individual has committed a "sufficiently serious offense," (2) the officer reasonably believes the individual is continuing to try to evade arrest or might take flight, and (3) the individual is aware the police officer is attempting to seize her. *See Goodrich*, 193 F. App'x 551. Plaintiffs allege that in the alternative, a police officer can force an individual to the ground, and use other force,

13

if the officer is confronted with a scene that is "sufficiently" chaotic that the officer is required to act quickly to gain control of the situation. *See Lewis*, 774 F.2d at 711. Plaintiffs contend it is clear from the cases cited by defendants that this is the well-established law in the Sixth Circuit, that the force imposed by defendant Schrand was excessive, and that the illegality of his actions was well-established as of the date of the incident.

Plaintiffs further seek to distinguish on its facts each case cited by defendant in his motion for summary judgment. Plaintiffs assert that in each of the cases cited by defendant, the person "swept to the ground" was either given a chance to comply with a police order before being taken down or the police were confronted with a sufficiently chaotic scene. (Doc. 25 at 9). Plaintiffs allege that defendant cites no cases for the authority that the police may take a suspect to the ground where the suspect has no knowledge she has been seized by the police and the police officer is not dealing with a chaotic scene that justifies his actions. Plaintiffs allege that because under their version of events defendant Schrand gave plaintiffs no "opportunity to comply" before "sweeping them to the ground," and because he was not presented with a "chaotic scene," his actions were unlawful and the unlawfulness would have been apparent to a reasonable police officer in light of clearly established Sixth Circuit law. (*Id.*).

The authorities proffered by plaintiffs do not clearly establish that as of September 1, 2009, a police officer could not use a sweeping leg maneuver on an individual suspected of a criminal offense unless specific circumstances were present. Taken together, *Goodrich* and *Lewis* support nothing more than the well-settled proposition that the totality of the circumstances must be examined in evaluating whether the force used was excessive and amounted to a constitutional violation. *See Graham*, 490 U.S. at 396.

14

Furthermore, neither *Goodrich* nor *Lewis*, on its facts, squarely governs Schrand's conduct in the case at hand. Nor do the results in those cases support the denial of qualified immunity to Schrand. In *Goodrich*, 193 F. App'x 551, the Sixth Circuit affirmed the district court's determination that the defendant police officers were entitled to qualified immunity on the plaintiff's claim of excessive force during his arrest. The plaintiff, who was suspected of domestic violence/aggravated assault, refused to comply with the officers' request to exit his van and instead proceeded to drive to another municipality's police station pursued by police vehicles with flashing lights. Although he obeyed the traffic laws on his way to the station, he refused to pull over and avoided a police road block by going in another direction. Once at the station, he exited his vehicle and walked toward the front door, at which point the officers took him to the ground without any warning, causing injuries which included a fractured and dislocated hip. The Sixth Circuit accepted that at the time of the plaintiff's arrest, the only crime he had committed from his perspective was disobeying unlawful commands to exit his vehicle and to pull over during the low speed chase. *Id.* at 555. The Sixth Circuit further accepted that from the plaintiff's perspective, he was not evading arrest because he claimed he did not know the police sought to arrest him and it should have been obvious he was going to surrender at a nearby police station. The Court stated, however, that the reasonableness of an officer's use of force is evaluated "not from the subjective perspective of the plaintiff but from the perspective of an objective officer." *Id.* (quoting *Dunigan v. Noble*, 390 F.3d 493, 551 (6th Cir. 2004)). Thus, because the plaintiff was suspected of the crime of aggravated domestic assault - a violent offense - the severity of the crime at issue weighed in favor of the use of force in apprehending the plaintiff. In addition, the Court found that the plaintiff's actions were at best ambiguous and

15

could be interpreted by a reasonable officer as a continued attempt to evade arrest. *Id.* at 555-56. The Court therefore found that a reasonable officer in the defendant's position would not have considered physically tackling the plaintiff to be an excessive use of force. *Id.* at 556.

Nowhere in its decision in *Goodrich* did the Sixth Circuit state that an individual must have been aware that a police officer was trying to seize him before the officer may use force against that individual; to the contrary, the Court stressed that the situation, including whether an individual's actions could be viewed as an attempt to evade arrest, must be viewed from the perspective of a reasonable officer at the scene. *Id.* at 555-56. Accordingly, *Goodrich* does not support plaintiff's contention that a police officer's act of sweeping an individual to the ground is unreasonable as a matter of law unless the individual is aware she is being seized.

Nor does *Lewis* show that the law was clearly established in 2009 that there must be a certain level of chaos as a matter of law before the police can sweep a criminal suspect to the ground. In *Lewis,* 774 F.2d at 714-15, the Court found that the officers violated the plaintiffs' due process rights under the Fourteenth Amendment by using excessive force against them by kicking the plaintiffs and striking them with nightsticks while they were restrained.[6] Plaintiffs here bring their claims under the Fourth, not the Fourteenth, Amendment and there is no allegation that defendant used excessive force against plaintiffs while they were restrained. Accordingly, *Lewis* is not relevant to this Court's Fourth Amendment analysis in the present case.

Nor have plaintiffs shown based on the cases cited by defendant in his motion for

---

[6] The Due Process analysis of excessive force claims for arrestees has been eschewed in favor of a Fourth Amendment analysis. *See Lewis v. City of Irvine, Ky.*, 899 F.2d 451, 456 (6th Cir. 1990) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988) and *Graham*, 490 U.S. at 396).

16

summary judgment that the clearly established law on September 1, 2009, required that either a criminal suspect must be given a chance to comply with a police order before being swept to the ground or the officer must be confronted with a "legally sufficient 'chaotic scene.'" (Doc. 25 at 9). None of the cases cited by defendant have facts that squarely govern this case. Rather, as is true of the authorities proffered by plaintiffs, each of the cases demonstrates that the Court must evaluate the totality of the circumstances and determine on a case by case basis whether the use of force was justified in a particular situation. *See Miller v. Cate*, 86 F. App'x 830, 833-34 (6th Cir. 2004) (court examined the totality of the circumstances in determining that although the plaintiff was handcuffed, pushed out the door, and fell on his head on the concrete after a confrontation with the police, the officers' actions were objectively reasonable given that the scene was becoming increasingly dangerous and out of control and the plaintiff was not cooperating); *Lowe v. Henson*, No. 3:05-CV-275, 2007 WL 2022205, at **6-7 (E.D. Tenn. July 11, 2007) (even if one plaintiff was tripped by the defendant agent and another was kicked and pushed to the ground while handcuffed, the agents did not use excessive force against the plaintiffs while arresting them during a drug "bust" as they were in a rapidly developing situation and the agents needed to gain control of the escalating scene immediately, so that removing the plaintiffs from the scene in a rough and quick manner was reasonable under the circumstances[7]); *Ford v. Retter*, 840 F. Supp. 489, 490-92 (N.D. Ohio 1993) (no jury could find a Fourth Amendment violation under the *Graham* analysis where the plaintiff initially did not answer the officer's order to come out of his motel bathroom; following an indeterminate period of time the plaintiff complied with the officer's order to put his hands out the door; and the officer then

---

[7] The Court noted, "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers . . . violates the Fourth Amendment." *Id.*, at *6 (quoting *Graham*, 490 U.S. at 396).

17

grabbed the plaintiff's extended hand, tripped him, and threw him to the ground, which caused the plaintiff to reinjure his knuckle); *Gorajczyk v. City of St. Claire Shores*, No. 08-14764, 2010 WL 3488646, at *6 (E.D. Mich. Aug. 31, 2010) (the defendant was entitled to qualified immunity on the plaintiff's claim that the defendant used excessive force by pushing the handcuffed plaintiff through a breezeway, which in turn caused the plaintiff to trip and fall on his hip, and by pulling the plaintiff back up by his shoulder as the plaintiff had not proffered "any authority which clearly establishes that an officer violates the Fourth Amendment when he pushes a handcuffed suspect in order to facilitate a seizure."[8]).

Thus, contrary to plaintiffs' argument, the authorities cited by defendant do not establish that as of September 1, 2009, either an officer was required to give a suspect a chance to comply with an order before sweeping an individual to the ground or that a certain level of chaos must have existed as a matter of law, such that a reasonable officer in Schrand's position would have known that using a leg sweeping maneuver on plaintiffs violated their clearly established rights.

Finally, defendant proffers in his reply memorandum a taser case with a factual scenario that is sufficiently similar to that of the present case so as to be dispositive of the question presented here on summary judgment: Whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no command by the police, had a clearly established right not to be swept to the ground by a police officer, on September 1, 2009. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491 (6th Cir. 2012). *Cockrell* demonstrates that even assuming defendant Schrand used excessive force against Jackee and Burnam, it would not have been clear to a reasonable officer in Schrand's position

---

[8]The incident in *Gorajczyk* occurred on November 16, 2005. *Id.*, at *1. However, the Court did not

that his conduct was unlawful in the situation he confronted.

The Sixth Circuit in *Cockrell*, 468 F. App'x at 495, defined the issue presented in that case as follows: "[W]hether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased on July 3, 2008." The Court found the defendant police officer was entitled to qualified immunity because even if the defendant officer did use excessive force, neither the case law, outside sources, nor the "obvious cruelty inherent in taser" use (*Id.*, quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)) would have put every reasonable officer on notice that the defendant's conduct violated the Fourth Amendment in July 2008. *Id.*

The facts in *Cockrell* were as follows: The defendant police officer exited his car and ran toward the plaintiff after observing him jaywalk. *Id.* at 492. The plaintiff ran away. *Id.* There was no indication in the record that the officer ordered the plaintiff to halt or put him under arrest. *Id.* After the officer chased the plaintiff a short distance, he shot the plaintiff with his taser, which temporarily paralyzed the plaintiff and caused him to crash headlong into the pavement. *Id.* The plaintiff was unable to break his fall and suffered lacerations and abrasions as a result. *Id.* The Court acknowledged that cases addressing qualified immunity for taser use fall into two groups: (1) "plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers," and (2) plaintiffs who are tased when they have done nothing to resist arrest or they are already detained. *Id.* at 495-496. The Court found that where there is resistance, courts conclude either that no constitutional violation occurred or that the right not to be tased while resisting arrest was not clearly established at the time of the incident.

---

indicate that there was any authority on this point as of the date of its decision, August 31, 2010.

19

*Id.* at 496 (collecting cases). The Court found that in the second group of cases, an excessive

force claim is available as the right to be free from physical force when an individual is not

resisting arrest is a clearly established right. *Id.* (collecting cases). The Court determined that

the case before it did not fit neatly within either group because at no point did the plaintiff "use

violence, make threats, or even disobey a command to stop. He simply fled." *Id.* The Court

noted:

> Yet flight, non-violent though it may be, is still a form of resistance. *See Azevedo
> v. City of Fresno*, 1:09-CV-375 AWI DLB, 2011 WL 284637, at *8 (Jan. 25, 2011
> E.D. Cal). "[A]lthough Azevedo was not physically resisting arrest, he was
> actively fleeing . . . The active evasion or flight by a non-felon generally favors a
> police officer's use of non-deadly force."); *Casey v. City of Federal Heights*, 509
> F.3d 1278, 1281 (10th Cir. 2007) (noting that determination whether officer used
> excessive force requires analysis of "whether [the person being pursued was]
> actively resisting arrest or attempting to evade arrest by flight") (quoting *Graham*,
> 490 U.S. at 396). Neither line of cases, then, dictates a particular result in this
> scenario; both apply in some measure.

*Id.* The Court stated that in no case where courts denied qualified immunity was the plaintiff

fleeing, and in at least some of those cases the court specifically referred to the fact of non-flight.

*Id.* at 496-97 (citing cases). By contrast, the Court noted that in all those cases where the

plaintiff fled from the police, the court held that qualified immunity was appropriate and in some

cases the court specifically referred to the plaintiff's flight. *Id.* In light of the case law showing

it was unclear "whether tasing a suspect who fled from the scene of a nonviolent misdemeanor

constituted excessive force, as of July 2008," together with a lack of consensus as to whether

taser use was "categorically improper, unsafe, or cruel," the court concluded it could not say that

every reasonable official would have understood that the defendant officer's actions violated the

plaintiff's Fourth Amendment rights. *Id.* at 498. The Court further noted that a different

outcome would not have been compelled even as of the date of its decision, February 23, 2012. *Id.* at 497.

Here, by plaintiffs' own admission, they were fleeing from the scene of an altercation in which they were engaged - a non-violent misdemeanor – after defendant Schrand arrived on the scene in his marked police car and when he swept them to the ground. (J. England Depo., pp. 42, 44, 47; Burnam Depo., pp. 51, 61). This a situation in which an officer's use of non-deadly force is generally favored. *See Cockrell*, 468 F. App'x at 496. According to plaintiffs, they offered no other resistance and did not disobey any command by defendant but they were swept to the ground without any verbal warning. (J. England Depo., p. 46; Burnam Depo., p. 53). Although plaintiffs testified that they were not aware that Schrand was approaching them or attempting to apprehend them, plaintiffs have not shown that the law as of September 1, 2009, required a verbal warning under such circumstances. To the contrary, Judge Cole wrote separately in a concurring opinion in *Cockrell* that while he would have found the use of a taser absent a warning about its impending use or an order to stop, or absent exigent circumstances that would have precluded such a warning, violated the plaintiff's Fourth Amendment right to be free from excessive force, he concurred in the majority opinion because the plaintiff did not have a right not to be tased for fleeing from a non-violent misdemeanor as of July 3, 2008. *See Cockrell*, 468 F. App'x at 498 (concurring opinion). Plaintiffs have not proffered any authorities subsequent to July 3, 2008 and prior to September 1, 2009, that altered the law in this regard and would have put a reasonable officer on notice that defendant Schrand's act of sweeping plaintiffs to the ground violated their clearly established Fourth Amendment rights. Finally, the force used was minimal.

21

The Court further notes that the situation defendant Schrand faced was much more tense and rapidly evolving than that faced by the officer in *Cockrell*. When he was parked in his cruiser across from NCHHS, defendant Schrand heard yelling and screaming and witnessed a crowd forming by the driveway that ran through the school field. (Schrand Depo., p. 16). He observed two girls square off and start throwing punches in the air toward each other as they moved closer together. (Schrand Depo., pp. 16-17). A large crowd of 100 to 200 students were gathered in the school field around the girls (Schrand Depo., p. 13; Smith Aff., ¶ 5; Mulcahy Aff., ¶ 6), and the crowd was egging the girls on to fight. (J. England Depo., p. 69). Schrand lost sight of the girls involved in the altercation when the crowd formed around them. (Schrand Depo., pp. 17-18). He then pulled his marked police car onto the driveway between the screaming girls. (Schrand Depo., p. 18; J. England Depo., p. 39). Schrand and the adults supervising the school field that day, Smith and Mulcahy, described the situation as a "riot" and Smith and Mulcahy further described the scene as "very loud and extremely chaotic." (Schrand Depo., p. 20; Smith Aff., ¶¶ 5, 7; Mulcahy Aff., ¶¶ 11). Schrand was the only officer in the large crowd of agitated students, and he had to act alone to calm a volatile situation that had the potential of escalating out of control and erupting into violence. The misdemeanants began to disperse once Schrand arrived (J. England Depo., pp. 42-44, 48-50; Burnam Depo., p. 51), so that Schrand had to take quick steps to apprehend the fleeing misdemeanants. He was forced to make split second decisions with respect to how to best accomplish the arrests without the assistance of other law enforcement officers and without enough handcuffs to restrain all of the misdemeanants. (Schrand Depo., p. 40). He chose the option of using a sweeping leg maneuver to stop some of the fleeing misdemeanants, which was one of the lesser use of force options

22

available to him. (Schrand Depo., pp. 27-30, 41-44). Plaintiffs have not shown that it was clearly established on September 1, 2009, that under such circumstances, an officer was required to provide a verbal warning before using a sweeping leg maneuver on a fleeing, non-violent misdemeanant who was providing no other resistance.

Thus, applying the principles derived from the above Fourth Amendment cases to the present case, the Court finds that the facts of record, construed in plaintiffs' favor with all inferences drawn in favor of plaintiffs, demonstrate that defendant is entitled to qualified immunity on plaintiffs' Fourth Amendment claims brought against him. The caselaw would not have put a reasonable officer on notice that defendant Schrand's act of using a sweeping leg maneuver to apprehend plaintiffs under the circumstances presented here violated the Fourth Amendment on September 1, 2009. Summary judgment should be granted in favor of defendant Schrand.

## IT IS THEREFORE RECOMMENDED THAT:

1.      Defendant's motion for summary judgment (Doc. 24) be **GRANTED**.

2.      The Court certify pursuant to 28 U.S.C. § 1915(a) that for the foregoing reasons an appeal of any Order adopting this Report and Recommendation would not be taken in good faith and therefore deny plaintiff leave to appeal *in forma pauperis*. Plaintiff remains free to apply to proceed *in forma pauperis* in the Court of Appeals. *See Callihan v. Schneider*, 178 F.3d 800, 803 (6th Cir. 1999), overruling in part *Floyd v. United States Postal Serv.*, 105 F.3d 274, 277 (6th Cir. 1997).

Date: 12/12/12

Karen L. Litkovitz
United States Magistrate Judge

23

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TISHA ENGLAND, et al.,                                    Case No. 1:11-cv-0093
        Plaintiffs                                   Weber, J.

                                                Litkovitz, M.J.

    vs

RYAN SCHRAND,
        Defendant

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

24